Filed 11/26/13  P. v. Leung CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>GARY LEUNG,<br><br>    Defendant and Appellant. | G046955<br><br>(Super. Ct. No. 10NF1679)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gregg L. Prickett, Judge.  Affirmed.

Patrick Morgan Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Gary Leung was convicted of committing a variety of sex crimes against his former girlfriend F.F. He contends reversal is required because: 1) The trial court used an uncertified interpreter; 2) his attorney failed to object to a nurse's opinion F.F. had been strangled; and 3) during its deliberations, the jury briefly had access to transcripts that were not admitted into evidence. Finding no basis to reverse, we affirm the judgment in all respects.

FACTS

Appellant and F.F. started dating in the fall of 2008, when they were juniors in high school. According to F.F., the first year of their relationship was healthy and normal. But after that, appellant became very jealous and controlling. It got to the point he would not even let F.F. talk to other guys, so she tried to break up with him. That only made appellant want her more. Desperate for F.F.'s affection, he often told her he was going to kill himself if she wouldn't be his girlfriend. He was also physically aggressive with her at times and threatened to kill anyone she became involved with.

Although F.F. wanted to move on with her life, she still cared about appellant. At times, she would succumb to his pleas, and they would get back together. But then he would become too controlling, and she'd break off their relationship. This "on-and-off" period lasted for about six months, from December 2009 to mid-May 2010. During this period, F.F. continued to have sex with appellant and spoke to him often because appellant was very needy and manipulative. She knew their relationship was unhealthy but couldn't extricate herself from it.

Finally, on the eve of Memorial Day weekend in May 2010, F.F. told appellant their romantic relationship was over for good. She also informed him she was dating a guy who lived in San Diego. In fact, that weekend she went to San Diego to visit her new boyfriend. But when she returned to Orange County on May 30, she agreed to have dinner with appellant. F.F. thought they were just going to have dinner "as friends," but appellant had other things on his mind.

2

Toward the end of their dinner, appellant told F.F. he wanted her to come over to his house that night. She said she wasn't interested in renewing their relationship and just wanted appellant to take her home. He said he would but asked if they could stop by his house first to pick up a few things. F.F. agreed that would be okay. When they got to appellant's house, he told her to go upstairs and wait in his bedroom, which she did. Tired from her trip to San Diego, she laid down on appellant's bed to rest.

Twenty minutes later, appellant came into the bedroom wearing only a thong. F.F. told him she wasn't interested in having sex, but he pulled her across the hallway into his brother's room, which was illuminated by candles and adorned with rose petals. When F.F. tried to leave the room, he threw her on the bed and started taking off her clothes. Although she told appellant to stop, he started kissing and groping her and eventually put his penis into her vagina. F.F. was screaming and trying to get away, but appellant was too strong. Using his body weight and chokeholds to restrain F.F., he didn't stop raping her until he ejaculated.

After that, appellant was "oddly caring." He started kissing and hugging F.F., but she was angry and called him crazy. That made appellant upset. In a fit of rage, he dragged F.F. into the hallway bathroom and made her take a shower, saying that was "the best way to get rid of evidence."

Following the shower, F.F. asked for a glass of water. When appellant left the bathroom to get it, she started screaming, and when he returned with the water, she threw the glass against the wall. Then he took her back into his brother's bedroom and raped her a second time. During this episode, F.F. was fighting appellant and screaming for help, but he subdued her by putting her in a chokehold. In addition to raping F.F., he also put his fingers in her anus and tried to sodomize her. When F.F. threatened to tell the police about what appellant was doing to her, he told her, "Then I guess I'll have to kill you."

3

After that, appellant forced F.F.'s head down to his crotch to give him a "blow job." Instead, F.F. began pinching and hitting appellant around his groin. Appellant then started strangling F.F. with his hands. However, fearful that would lead to bruising, he removed his hands and wrapped his arm around F.F.'s neck. The pressure from this chokehold caused F.F. to blackout momentarily. When she awoke, appellant was on top of her. He was on his cell phone, talking to his mother Becky, who had just arrived home with appellant's father. They were locked out of the house, so appellant agreed to go downstairs and let them in.

Before leaving the bedroom, appellant told F.F. to get dressed and act like nothing had happened. At some point, he also told F.F. that if she wasn't going to start dating him again, he was going to tell her new boyfriend that they had had sex. F.F. wasn't worried about that. As soon as appellant left the room, she started screaming for help. She then ran out into the hallway naked, hoping appellant's parents would help her. However, after letting his parents inside the house, appellant ran back upstairs and pushed F.F. back into his brother's room. He was holding her tightly and covering her mouth, but she was still yelling and crying when appellant's parents came to the room.

Becky told appellant to let F.F. go, but he said "no . . . [t]his bitch is going to tell the cops. Let's just kill her." He then pushed F.F. onto the bed and started strangling her. Becky grabbed appellant and told him, "Gary, stop. You're already 18." This interference allowed F.F. to escape appellant. While she was gathering her clothes and making her way out of the room, appellant made a shooting gesture toward her with his hands. F.F. fled the house and ran to a fast food restaurant across the street.

At the restaurant, F.F. called a friend to come and pick her up. When the friend arrived, F.F. was crying, shaking and looked like she was in shock. They drove straight to the police station, where F.F. reported that appellant had raped her. After taking her statement, the police had her undergo a sexual assault exam.

4

The examination was conducted by Leanne Matheny, a registered nurse. Matheny observed a small bruise on F.F.'s lower lip and "multiple red marks" around her neck. She also noticed redness and abrasions on F.F.'s chest, back and shoulders. In addition, she detected very tiny bruises (petechia) just under F.F.'s left jaw. Matheny believed F.F.'s injuries were consistent with her claim that she had been strangled.

Matheny did not detect any signs of visible injury around F.F.'s genital area. However, she testified that did not prove F.F. had not been raped, because forcible sex does not always result in physical injury. In fact, the chance of physical injury is diminished when, as here, the victim has a sexual history with the alleged assailant.

Speaking to that history, F.F. admitted at trial that she and appellant had engaged in "consensual rough sex" in the past. On one occasion, appellant had even talked about experimenting with strangulation in order to enhance their sexual pleasure. Appellant wanted F.F. to strangle him while they were having intercourse, and she agreed to do so on that one occasion. However, she stopped after a few seconds because she didn't like it, and they never did anything like that again. Despite their sexual history, F.F. testified she did not consent to having sex with appellant on the night in question.

Two days after the alleged rape, on June 2, 2010, the police had F.F. place back-to-back covert phone calls to appellant to see if would make any incriminating statements. During the calls, appellant begged F.F. to take him back and admitted he "fucked up last time." When F.F. asked him why he went crazy and strangled her, he said it was because she was being untrue to him with her new boyfriend. He also said, "I know what I did was wrong, and I never want to do it again." "I feel guilt. I'm sorry. I'm sorry for hurting you."

F.F. tried to get appellant to own up to the specific things he had done to her, but he refused to do so out of concern their conversation was being recorded. In fact, at several points during the call he expressed concern the police were listening in, telling F.F., "I'm not stupid." "I know what your plan is." He said he couldn't expressly admit

to raping F.F., because that would amount to a "confession" and he would rather die then be labeled a sex offender. However, he did tell F.F. he was sorry for strangling her, tying her down, making her cry and making her do things she didn't want to do. He told her, "I'm sorry for forcing myself upon you. I'm sorry for . . . hurting you." He also apologized for tricking F.F. into coming into his house in the first place and promised he would never force her to have sex with him again.

Police Officer Kathleen Helmick said she interviewed F.F. when she arrived at the police station on the night in question. F.F. told her that, after dinner that night, appellant asked her if she wanted to come over to his house to watch a movie, and she agreed. And once they got there, she went up to appellant's bedroom to take a nap because she was tired. However, F.F. insisted she did not consent to having sex with appellant that night.

With the aid of a Cantonese interpreter, appellant's mother Becky also testified on appellant's behalf. She said that after appellant let her and her husband into their house on the night in question, she spoke to appellant briefly before he went upstairs. Then, a few minutes later, she and her husband went upstairs, as well. Becky heard appellant and F.F. arguing in the bedroom, so she went to the doorway to see what was going on. She told them to stop arguing and offered to take F.F. home. When F.F. tried to leave, appellant stopped her and said, "Don't go yet. I want to talk to you." However, Becky told him "it's too late now, as a girl she should go home." After that, appellant let her go, and she left the house. Becky followed F.F. across the street and again offered to take her home. However, F.F. told her she had a friend who was coming to pick her up, so Becky went back home.

Appellant was charged with attempting to murder F.F., as well as two counts of forcible rape and one count each of attempted forcible oral copulation, forcible sexual penetration with a foreign object, and false imprisonment. In closing argument, defense counsel argued F.F. consented to having sex with appellant on the night in

6

question. Counsel theorized that after they had sex, F.F. realized it would complicate things with her new boyfriend, so she falsely accused appellant of raping her. The jury did not buy that theory. Although it acquitted appellant of attempted murder (convicting him instead of simple battery), it found him guilty of the remaining charges. He was sentenced to 19 years in prison for his crimes.[1]

## I

Appellant contends he was denied a fair trial because Becky's testimony was translated by an interpreter who was neither certified nor provisionally qualified. We disagree.

Although Becky's native language is Cantonese, she admitted on the witness stand that she knows some English. This fact was evidenced throughout her testimony, in that she often answered or attempted to answer the attorneys' questions before they were translated from English into Cantonese. It also appears Becky may have corrected the interpreter or changed her answer at one point during her testimony.

This happened while Becky was being questioned about F.F.'s demeanor in the bedroom. Although F.F. testified she was crying and yelling when Becky and her husband came upstairs, Becky testified the only reason she went to the bedroom is because she heard appellant and F.F. "arguing." On cross-examination, the prosecutor asked Becky if she ever heard F.F. yelling, and she initially answered, "[F.F.] was crying very loudly." However, before the prosecutor could posit another question, Becky volunteered, "She wasn't crying loudly. She was speaking loudly." At that point, defense counsel objected, and the judge spoke with the attorneys outside the presence of the jury.

---

[1] Appellant was also charged with forcible rape against a second victim, M.D., whom he dated before he met F.F. Because the jury acquitted appellant of raping M.D., we have omitted the facts pertaining to that charge.

7

Defense counsel said it appeared as though Becky had corrected the interpreter, meaning she had corrected his English interpretation of her Cantonese testimony. However, the prosecutor surmised Becky may have actually said F.F. was "crying loudly" but then changed her answer to "speaking loudly." The court said that was an issue for the jury to decide. It also told defense counsel that once Becky finished her testimony, he was free to call the interpreter to the stand and question him about this issue. He never did so.

When Becky's testimony resumed, the prosecutor asked her, "A moment ago, you said [F.F.] was crying loudly, then you said speaking loudly. Which one is it? What did you hear?" Becky answered, "You misunderstood me. She wasn't crying too loud." Then Becky said the only thing she heard was "regular arguing." However, after that, she admitted she also heard and saw F.F. "crying lowly."

Following Becky's testimony, the court was informed the interpreter was not certified. The interpreter confirmed this, but told the court he was "proficient" in Cantonese. He also swore that he translated Becky's testimony to the best of his abilities. When the court asked the parties if there was anything they wanted to ask the interpreter, they both said no.

A criminal defendant has a constitutional right to the use of an interpreter at his or her trial. (Cal. Const., art. I, § 14.) Among other things, the right is designed to "make the questioning of a non-English speaking witness possible." (*People v. Carreon* (1984) 151 Cal.App.3d 559, 565, fn. 1.) While interpreters are generally required to be certified, the trial court may utilize an interpreter who is neither certified nor provisionally qualified if good cause is shown. (Gov. Code, § 68561, subd. (a).) In that situation, the court must make a record why good cause exists, obtain a waiver from the defendant and ensure the subject interpreter is qualified to interpret the proceedings. (Cal. Rules of Court, rule 2.893 (formerly rule 984.2).)

Although these procedural requirements are designed to safeguard the defendant's right to an interpreter, "[t]he failure to follow [them] alone does not give rise to a constitutional violation." (*People v. Superior Court (Almaraz)* 89 Cal.App.4th 1353, 1360.) "Improper procedures in the use of an interpreter do not rise to the level of a constitutional violation unless they result in prejudice demonstrating defendant was denied his right to a fair trial." (*Ibid.*)

In this case, the record indicates the court did not discover the interpreter was not certified until after Becky testified. Thus, the court did not follow the usual procedures respecting the use of a noncertified interpreter. But there are two reasons why that failure does not require reversal. First, defense counsel declined the court's invitation to question the interpreter about his qualifications or his interpretation of Becky's testimony. By turning down the offer to flesh out any potential ambiguities in Becky's testimony or any possible weaknesses in the interpreter's language skills, the defense relinquished its right to challenge the interpreter on appeal. (See *People v. McCullough* (2013) 56 Cal.4th 589, 593 [for reasons of efficiency and fairness, a right of any sort may be forfeited on appeal if the defendant fails to assert it in the trial court].)

Second, appellant has failed to demonstrate prejudice. He contends the use of a noncertified interpreter violated his due process rights because the interpreter botched a key aspect of Becky's testimony, i.e., her description of F.F.'s demeanor in the bedroom. In fact, it is by no means clear the interpreter made a mistake there. And what's more important, whether Becky testified F.F. was "crying loudly" or "speaking loudly" when the prosecutor initially raised the issue with her was largely immaterial because Becky subsequently admitted she heard and saw F.F. crying in the bedroom. It was abundantly clear from her testimony that F.F. was distraught at that time. It was also evident from F.F.'s testimony that Becky lacked personal knowledge about the particular allegations F.F. leveled against her son. That being the case, there is no basis for

9

reversal. The use of a noncertified interpreter to translate Becky's testimony did not violate appellant's right to a fair trial.

II

Appellant also contends his attorney was ineffective for failing to object to nurse Matheny's opinion that F.F.'s neck injuries were consistent with her claim that she had been strangled. Again, we disagree.

In order to succeed on a claim of ineffective assistance of counsel, a defendant must show counsel's performance was objectively unreasonable under prevailing professional norms. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) The defendant must also affirmatively establish prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) To do this, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid*.) Under this standard, the defendant "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937.)

Appellant claims his attorney was remiss for failing to object to nurse Matheny's opinions about the cause of F.F.'s neck injuries because she was not qualified to offer such opinions. However, even assuming that to be true, Matheny's opinion about F.F.'s neck injuries cannot be said to have prejudiced appellant in any material sense. In her covert phone calls to appellant after the crime, F.F. repeatedly asked him why he strangled her. He said it was because he was hurt and upset over the fact she was seeing someone else. When F.F. asked him if that gave him the right to strangle her, appellant said, "It does not give me the right. I'm sorry. That was wrong." He also acknowledged that strangling F.F. was a "big deal" and promised not to hurt her in the future.

10

Appellant's admissions in that regard were corroborated by Matheny's observation that F.F. had "multiple red marks" around her neck when she examined her after the incident. So even if defense counsel had successfully objected to Matheny's opinion that F.F. appeared to have been strangled, there was overwhelming evidence apart from her opinion to prove that fact. In light of this, it is not reasonably probable appellant would have obtained a more favorable result had his attorney acted differently. We discern no violation of appellant's right to effective representation.

### III

Lastly, appellant contends the trial court committed reversible error by allowing the jury to consider transcripts that were not admitted into evidence. This claim also fails.

The transcripts were of the recorded phone calls F.F. made to appellant on June 3, 2010, four days after the alleged offenses. They were provided to the jury when a recording of the calls was played during the trial. At that time, the court informed the jurors the transcripts were not evidence but they could use them to help them understand the recording. The court also told the jurors the transcripts were "an extension of [their] notes. You may write on [them], circle things, do whatever you want with [them], make corrections, whatever. . . . [T]hese transcripts will go back into the jury room with you when you deliberate and then will be destroyed at the conclusion of your deliberations."

The transcripts were marked for identification purposes but were not admitted into evidence. However, when the jurors began their deliberations, they had the transcripts in their possession. Not knowing if this was correct, the bailiff immediately brought the issue to the court's attention, and the court ordered the bailiff to collect the transcripts. Thus, the jurors only had the transcripts during their deliberations for about three to five minutes.

After discussing the issue with counsel, the court sent a note to the jurors asking if any of them wanted to see any of the notes they may have written on the

11

transcripts. Five of the jurors responded in the affirmative. The court summoned them into the courtroom and explained, "Ladies and Gentlemen, I misspoke earlier when I told you you could have the transcripts. I was in error. The transcripts are not in evidence and will not physically go back into the jury room but I told you you could make notes on them. And so I understand you may want to see those notes. So we're going to pass your transcripts back to you and ask you to transfer them over to your notes. I'm sorry but that's [the] procedure[] we need to follow." Four of the jurors transferred their notes from the transcripts, and the fifth juror decided he did not need to do so.

Although error, allowing the jurors access to "never-admitted evidence" in the form of the transcripts is subject to harmless error analysis. (*People v. Gamache* (2010) 48 Cal.4th 347, 396-397.) The transcripts themselves are approximately 35 pages long, and there is nothing in the record to suggest the jurors actually considered them during the short time they had them at the start of deliberations. Nor is there any indication the transcripts did not accurately reflect the contents of the actual recording, which the jury heard and was properly allowed to consider in deciding the case.

Appellant's statements on the recording effectively amount to a confession of the charged sex offenses. Although he didn't come out and admit he "raped" F.F. – he feared their conversation was being recorded – he did apologize for tricking her into coming over to his house, tying her down, strangling her, forcing her to have sex, and hurting her. In light of these statements, and all of the other evidence presented in the case, we are convinced the jury's brief access to the phone transcripts during deliberations was harmless beyond a reasonable doubt. Whether considered alone, or in conjunction with the other alleged errors, it does not warrant reversal.

12

DISPOSITION

The judgment is affirmed.


                                        BEDSWORTH, J.


WE CONCUR:


O'LEARY, P. J.


ARONSON, J.